Back on the record, our next case is Spinner Consulting v. Bankruptcy Management Solutions, number 19-2371. If you could just hold on one second, this gentleman is leaving. Okay, you may proceed. Good morning, Your Honor. Good morning. I'm Bill Dunigan for the plaintiff, Appellant Spinner. And with the Court's permission, I'd like to reserve six minutes of a rebuttal. Boy, that's a lot. Okay, I guess so. Sure. Grady. Thank you. This is a punitive class action. It involves a horizontal conspiracy between three nationwide software providers. They control 99 percent of the national market for bankruptcy software services. The three software providers, it's alleged in the complaint, have conspired. So conspired to fix the matter of selling and charging for bankruptcy support services. We're very familiar with the facts. I mean, we've got some knotty issues of antitrust standing here. But I'm wondering if the easiest way to deal with this is simply with the release language. Perhaps you could deal with that. Very broad release. Well, it's a broad release, but for purposes of the present case, I think we have to look at two narrow issues. The estate is the one that has the rights. Let's begin with that premise. Then the question is, who is the releasee? And the third question is, what claims are released now? The release language provides on page Appendix 103 that the state has the right to release the parties, the creditors, and the above-named parties in interest. This is about four lines from the bottom. Now, it is clear that BMS is not a party to this release. The only way is to go on. I mean, if you go on, it says, and the blah, blah, blah, including independent contractors. Right. BMS is not an independent contractor? I don't think so. Why not? Well, we have to take it in two parts. Independent contractor of who? They're making two arguments. In the district court, they argued that it was an independent contractor of the trustee. Now, it did not have a contract with the trustee. The contract that was signed, which is in the record, provides that the trustee is signing only in his capacity as an agent, as the trustee of the estate. Who hired BMS? Who hired BMS? Hired is an ambiguous question, Your Honor. Who pays? Who pays? Who pays BMS? That's clear. The estate pays BMS. Well, somebody brought him on board, and there was an agreement that he would represent the trustee. Isn't that the case? Well, there was an agreement. The trustee signed his name on it. When he signed his name, he signed his name in the capacity of the trustee of the estate. He's in the same position, essentially, as a corporate officer. He is acting, the entity which is signing, which is the party to the contract, is the estate. The trustee is signing his name on behalf of the estate, in his capacity as the trustee. So the trustee is not in privity of contract, does not have, is not a party to a contract. Just one more question. Sure. Who can hire and fire BMS? The trustee is the individual who has to make that decision. But the contract from which BMS is being fired is the estate's contract. So it's like the president of a corporation can make a decision to fire the general manager of such and such. But the contract between the general manager of such and such is still with the corporation. So there is no, but there, and in that situation, there still is no contract between the president of the corporation and the general manager of such and such. Why does that, why does any of that matter, though? Sorry, I'm just not following. Well, that's a good question. Because if you look at, I mean, for BMS to get any relief out of this, it has to be a third party beneficiary. Because it's not specifically named. It's not a party to this agreement. For it to be a third party beneficiary, people have to intend to have a third  And if you look at the BMS contract, it says that the third party beneficiary has to intend to release it. That means the parties who are actually signing the document and offering consideration to each other have to intend that BMS would get a benefit out of this. There is no evidence of that whatsoever. Is that even before us? It was raised the first time in the reply brief, wasn't it, the third party beneficiary issue? Well, it was raised in the clip. Well, for sure. Well, that doesn't mean it's preserved for, it doesn't mean that it was raised on appeal. I think it is raised on appeal, Your Honor, because we appeal from the decision on standing. That's the only thing that the district court was ruled on. They are saying there are other bases upon which to affirm this. And to that, we get to respond. And the facts that we are relying upon are in the record. Right. Well, it's your appeal. So you set, you set, well, you set the issues. Your problem, of course, is standing. Maybe you can address it. I trust standing. I'm sorry. I apologize. Standing. Standing. In order to demonstrate standing, we have to show who the direct purchaser was, who the rights of the direct purchaser went to, and how Spinner ended up with that. The district court, at various parts of its opinion, is in agreement with us on each of those three issues. It agrees that the direct purchaser is the estate. There really can't be any other answer because the estate is the only one that paid any money. As a result of the May 6, 2016, order, Fusari individually, he was a debtor, ended up with the residual rights of the estate. That's not disputed. The district court found that. Then, as a result of an agreement in 2018, Spinner acquired the rights of Fusari individually with respect to the estate. So there is a clear chain of title. The district court found each of those three things in its opinion and erred by failing to recognize in the analysis section on pages 29 and 30 of its opinion that Fusari actually acquired the rights of the estate and was not simply asserting the rights of a debtor. And that's how you say you acquired the right to file a claim against BMS? Yes. As opposed to the trustee having that right if the trustee chose to do so? The trustee had the right for a certain period of time. While the estate owned the claim and while the trustee was the trustee of the Chapter 7 estate, the trustee could act. After the estate, then chronologically, the next thing that happened was the case converted to Chapter 11. That got rid of the Chapter 7 trustee. After the case converted to Chapter 11, the case settled as a result of the May 6, 2016 order. Under that order, all the residual rights of the estate reverted to the debtor Fusari. Fusari at that point had, if he knew about it, the right to sue BMS. He didn't. He sold his interest, including his right to sue BMS, to Spinner. That's why we're here. There's a complete chain of title. I believe I made you remember what bottle top you are. Okay. All right. Thank you, counsel. Good morning, Your Honors. I'm Jonathan Herman from Dorsey & Whitney, representing BMS. The decision should be affirmed for six reasons. The one, the district court. That's a lot of reasons, Hank. Yes. The one the district court came down with and relied upon, namely that Fusari and Spinner were not the direct purchasers or any purchaser at all of BMS's services, and that they therefore had no antitrust standard. The other five reasons, which we all argued, which we argued below, were not reached by the court. Spinner is not the proper party under the Associated General Contractors' test. It's not the most efficient enforcer of the antitrust laws. It's neither a competitor nor a customer, and neither was Fusari. Well, Fusari acquired, didn't Fusari acquire claims, any claim that could be made against BMS? Actually, no. Fusari acquired no claim because those claims were released. By the time Fusari... Well, the agreement says all property, right? In the order of May 6th, Fusari released all of his claims. The estate released all claims against the independent contractor. The estate released, the estate and Fusari released against the independent contractors of the trustee of Fusari and themselves. If you read that, if you read that release, you'll see it's the most comprehensive release you can possibly have, and they're basically saying we're releasing not only our own independent contractors, but we're also releasing the trustees. What's the purpose here? I thought it was a little unusual reading it. Everybody released everything as to everybody. That's right. It's a very comprehensive release. Is that common? Well, it is in the context of the fact that what was going on here was that there were tremendous claims in this estate, and they were all compromised, every single one of them. There were millions of dollars left on the table as a result of that. In fact... Well, all of that goes back to Fusari, doesn't it? No, it doesn't go back to Fusari. There was nothing left in the estate. Oh, nothing left. Zero. And the reason for that is there were millions of dollars' worth of claims. The only ones who got their full claims paid were the IRS and the U.S. trustee. Everybody else took a haircut. So there was no... There was nothing left in the estate. So going back to the Associated General Contractors test, again, Fusari and his assignee were not the customer or the competitor. And then the second is the release, and we've been talking about that. And third is under Twombly. Spinner never plausibly pleaded any contract combination or conspiracy between VMS and its purported horizontal competitors. Of course, the district court didn't make any ruling at all under Twombly. No, the district court did not reach this issue. I'm saying that you can reach this issue, Your Honor, because if you look at it, there's no who, what, when, where, or how pleaded whatsoever. And there's no illegal agreement between VMS and TES or EPIC that's pleaded at all. They're just unwarranted conclusions that are alleged on information and belief. What does Spinner plead? He pleads, and he attaches to the complaint, the white paper that VMS prepared for the EOUST, the Executive Office of the United States Trustee, in honor of the Justice Department. So it's violating the antitrust laws. I'm telling the Justice Department about it. Well, what does it do in this thing? In this, VMS in 2010 learned that the banks that were then supporting this market, this Chapter 7 market, and accepting deposits from Chapter 7 estates, were no longer going to do it. It's own bank was going to leave the market. And without the bank's participation, there would be no place to put these funds. This is your North Pennington argument? This is part of the North Pennington argument, but it's also part of the argument about there being no restraint of trade being pleaded. Because what happened here is with the risk of the market collapsing, VMS goes out, it talks to the banks, not its horizontal competitors, but the banks who were actually its future customers in some ways, because it had to have a bank to do business with. May I ask you a question? When all was said and done, the estate in this case, the bankruptcy estate, reverted back to Fisari. Isn't that the case? What was left of it, yes. What was left of it. Now, included in what was left of it was an assignment of the estate's antitrust claim. Isn't that the case? It could be, except that it had already been released in the same document. So there was no existing... There were no claims. No existing assignment of the estate's antitrust claim against VMS? There were no claims. Those claims had been released in the same document, the same... When you say released, you mean not finished? I'm saying every claim of every kind, foreseen and unforeseen. So if I understand you correctly, there was nothing to assign to Fisari. That's correct. Hypothetically, if your client were to... Well, if the estate, now in Spinner's name, were to prevail, what would happen to the money? They'd put it in their pocket or would that go to creditors? That's another problem under AGC, Your Honor. Under the associate general contractor's test, what you're looking at is what are the problems here? Is there going to be duplicate recovery? Why aren't we going to let the trustee, who, by the way, is the only one who could use the services of VMS, the only one who contracted for the services of VMS? VMS only provides services to trustees. And it was deciding at that point that... I guess I lost my train of thought. Can I just ask you, I mean, I asked the other side, your friend across the aisle, about the release, the release issue. I'm not, I mean, maybe piecemeal ask you, but do you have anything more to add on the release issue? Can you decide the case solely on that? You could. You could. I mean, basically, both, as I said, both Fusari and the estate released VMS in that May 6 order. And even if VMS is deemed to be the estate's independent contractor, it was being released. All claims known or unknown, foreseen or unforeseen, including all claims, quoting, that were raised or could have been raised in the bankruptcy case or relating to the bankruptcy case. And that's... And that, I guess, clearly includes the claim here, right? Yes, that includes the claim here. But Mr. Madigan's case, the case that he would like to pursue, is based on what appears to be harm to the estate by the charging of exorbitant fees. So he would like to file a claim, antitrust claim on that basis. What's wrong with that? Your Honor, there was no harm to the estate. Well, it's a matter of proof, isn't it? Well, not exactly, because I find... It is harm to the estate if there are just two players and they collude with each other as to what the fee should be that they would charge in many, many cases. Let's say it's double, okay? Let's say it's double and then treble that. And we're talking about over $100,000 maybe. Although I don't think it even gets to that. I think it would get to more like $90,000. If that were the case, millions of dollars were left on the table. There was no money left in the estate at the end of the day. So that means all those... You don't want the decision to be made on that basis. Excuse me? You don't want our decision to be made on that basis. No. I mean, frankly, any decision that grants the affirmance of the decision below is fine with me. So could you go back to Judge Fuentes' question which deals with the interpretation of the release, not the harm? How is it that you... Let me ask it this way. This is a matter of State law, right? So are there State law decisions that we could be looking to where a State court, a New Jersey State court, has interpreted a similarly broad language and reached the conclusion you're looking for? No, Your Honor. I know of none, and none are actually cited in any of the briefs. I have to say that this seems to me to be the most comprehensively broad release you can possibly have. And I think... Spinner says that to reach the interpretation you're urging, you have to find that essentially they're releasing themselves, that the estate was releasing itself here, right? So what... Is there any principle in State law or even common law that says, well, we've found those kinds of agreements? I think that was just an effort to make this the most comprehensive and broad release. But if you don't make DMS an independent contractor, then you're not interpreting the language of the release. I mean, I guess is the thought, we want finality and this is the way to achieve it? Everybody walks away and that's it? Yes. And I think, you know, going back to the AGC test for a second, there has to be a causal connection between the antitrust violation and the harm to the plaintiff. If there's no money in the estate and there's nothing that even a judgment could bring to the plaintiff, because it's all going to the creditors anyway. As Judge McNulty said, the creditors are upstream of the debtor and they're certainly upstream of Spinner. And as a result, there's no directness here. There's all... Basically, there's no motive either. The motive here, which is one of the AGC factors, the motive here is that BMS was actually trying to save the market with the help of the EOUST, was reaching out to the EOUST saying, if you don't lift the ban on Chapter 7 trustees being charged something, there's not going to be a market here and the bankruptcy system is going to collapse. It's not a question of charging, it's a question of charging too much. Well, the EOUST was not addressing whether it was too much or too little. It didn't address the amount or the percentage. All it did was say, you can lift the ban and you can charge in this way if you want to. And in doing so, actually, one U.S. trustee from the Northern District of Illinois actually said in the hyperbaric case, which is all cited in the briefs, that this helped to save the market, that it was necessary because the old model had evaporated, the interest rate model had evaporated. And that same trustee concluded that proposed solution actually increased competition and transparency in pricing bankruptcy support services. How do you increase competition when you really, as I understand the background here, there are really only two or three major players in the country that provide these services. And that's exactly Spinner's argument. You've cornered the market, you can collude with each other as to what you're going to charge, and that's the antitrust claim. Well, they actually charge different amounts, number one. Number two, they have different cutoffs for the amounts, you know, where maximums and minimums. There are lots of variations in the pricing, but beyond that, that U.S. trustee said trustees can now comparison shop based on price and quality of service. So there were differences and there were reasons. And frankly, this case is really more like McCarthy versus Ricordex. And in that case, there was no antitrust stand. It's the same situation as this. The heart of your argument is that Spinner has no antitrust claim or standing in this case. There's no standing. There's a release. There's no penalty. There's no adequate pleading. And they should have raised these claims in the bankruptcy court below. Thank you. Thank you, counsel. Your Honor, let me try to make as many points as I can in no particular order. The first place I wanted to start is that there was a colloquy in my adversary's argument about this is a broad release. Everybody is releasing everybody from everything. Right. That's not the case. If we look at Appendix 104, the critical language is what is the scope of the release? If we assume the estate is doing the releasing and we assume that we can find BMS somewhere in this release, then the question is what is released? And I leave the third line down. Excuse me for one second, Michael. I think we start at six minutes. Maybe even seven. Okay. Oh, I got you. Okay. Okay. Go ahead, sir. Sorry. The third line down, this is the scope of what is released. Quote, that the debtor or any of the entities has, had, or may have. Conspicuously absent is the word estate. The claim here is being asserted on behalf of the estate as a successor to the estate. Now, if we look at page Appendix 103 in the third line of C, it says the applicable parties, the estate, and the debtor. The estate was conspicuously set forth there. But when we get to what is the scope of the release, the word estate is missing. The only implication that I could draw from that is that the claims of the estate, unless they were also the claims of the debtor, are not released. This claim against BMS was never a claim of the debtor until the debtor had paid off all the money in 2018 and assumed the rights of the estate. This claim arose post-petition. It did not exist prior to the bankruptcy. Therefore... Counsel, you're reading from 5C, right? I'm sorry, Your Honor? You're talking about 5C, the release provision? 5C, Your Honor. Right. Where it says the debtor or any of the entities have or may have. Yes. So when we look at the definition of the parties, isn't the estate one of the entities? Robert Frisari, on behalf of himself, his Chapter 11 estate, et cetera, et cetera, et cetera, collectively the entities. No. No. I think the entities are the Frisari-owned corporations in LLCs. That's what the releases were being released upon. I mean, the estate is specifically set forth on the third line of C as an entity distinct from the debtor and the entities. So I think it would be a mistake to conclude that the entities includes the debtor in, at least in the latter part of paragraph C or 5C. Now, even, even if you can, I mean, you may say, boy, you're reading that too closely and you're just, and you're just finding ambiguity when none exists. The problem here is that there was no ambiguity as to whether or not B.S., B.M.S. was going to be released. B.M.S. had not made an appearance in this case. Very few people, if anyone, at the time knew who B.M.S. was because it inserted the bank between itself and the parties to the bankruptcy so that no one could figure out who it was at that time unless you dug. The clear intent of the parties was to release the people who were coming to court and the people that were, had rights under them like Moses and Singer, the counsel for the trustee got a release for itself, its employees, its independent contractors. Its secretary is going to get released. Somebody that it had a contract with, for example, Microsoft, would not necessarily be released. If Moses and Singer had a contract with Sony, which is identified as a party that was claiming it was entitled to some money at some point, that additional party is not going to be released. Sony is not released. Do you have any case law that supports your point? In our reply brief, we cited a couple of cases from the New Jersey courts which held for the proposition that, and I'm looking at page 16 of my reply brief, Broadway Management v. Rutgers the determining factor is to the rights of the third party beneficiary is the intention of the parties who actually made the contract. Conceptually, there should be a distinction here between what is manifested, which the parties negotiated and relied upon, versus what they subjectively intended. What I'm getting out of New Jersey law is you have to look at what the parties who actually negotiated the contract said and what the parties said was that the third party interloper should be able to come in and take advantage of that loose language. And, in this case, because the estate's claim was not being released, BNS can't even take advantage of that. There was a case out of the Seventh Circuit which held that an antitrust claim belonged to the estate and that was properly assigned to Spinner. Yes. You must be familiar with that. Through Fusari individually. It went from the estate in this case from the estate to Fusari individually as a result of the May 6, 2016 order and then as a result of an assignment agreement to Spinner. The chain is clearly there. The issue was raised what happens if any of this money is actually recovered by Spinner? Where does it go? The answer is it goes to Spinner and the other people and if it's a class case it goes to Spinner and if it's a class case      if it's a   it goes to Spinner and if it's a class case it goes to Spinner and if it's